**UNITED STATES of America, Plaintiff–Appellee.**

v.

**Ovidio CAMEJO, Luis Rivera–Torres, Livingston K. Smith, Luis F. Setien, Raul Anchia, Defendants–Appellants.**

No. 89–5707.

United States Court of Appeals, Eleventh Circuit.

April 22, 1991.

---

Jeffrey S. Weiner, Miami, Fla., for Camejo.

Russell K. Rosenthal, Coral Gables, Fla., for Smith.

Charles G. White, Miami, Fla., for Setien.

Benjamin S. Waxman, Jefrey S. Weiner, Miami, Fla., for Anchia.

Victor Martinez, Bruce Kessler, Asst. Federal Public Defenders, Miami, Fla., for Rivera.

Dexter W. Lehtinen, U.S. Atty., Phillip DiRosa, Mayra R. Lichter, Linda Collins Hertz, Miami, Fla., for U.S.

Before TJOFLAT, Chief Judge, EDMONDSON Circuit Judge, and DYER, Senior Circuit Judge.

DYER, Senior Circuit Judge:

Five defendants, who were employees of Eastern Airlines, appeal their convictions

of conspiracy to import and to possess with intent to distribute cocaine. The multiple assertions of error in the trial below do not raise any grounds which require reversal. We affirm the convictions.

## BACKGROUND

Ruy Martinez, an Eastern Airlines baggage handler at the Miami International Airport, organized a scheme to smuggle cocaine from Colombia through the use of incoming commercial flights to be off-loaded in Miami. Between 1982 and 1984, large quantities of cocaine loaded into suitcases were delivered into the airport, hidden in various aircraft compartments. In the smuggling operation, Martinez used the services of baggage handlers and supervisors. Martinez paid the individuals for their participation after each flight where cocaine was off-loaded. Each individual performed a specific task to accomplish removal of the luggage from the designated incoming flights and its delivery through the airport. The supervisors who were involved either made sure that baggage containing cocaine on Eastern flights was always off-loaded by the crews of conspirators or kept non-conspirators away from aircraft during crucial times. Martinez' crew used baggage carts to deliver the contraband to Frank Bascaus, an agent of Mexicana Airlines, who would move the cocaine through the airport using an elevator.

Each appellant participated in this scheme along with a number of other baggage handlers recruited by Martinez. Raul Anchia's role was to work inside the aircraft removing the cocaine-filled suitcases from their hiding places. Anchia earned $15,000 to $30,000 per flight. Luis Setien, as lead man on a ramp, was responsible for directing his crew of baggage handlers toward the aircraft to be unloaded and supervising his crew as cocaine-filled suitcases were off-loaded. Initially, Setien had been paid $5,000 per flight for his silence regarding the conspiracy once he discovered what the others were involved in. Later, his active participation increased and he was paid $10,000 per flight by Martinez. Ovidio

Camejo was a tractor driver in the vicinity of the off-loading operations. He created diversions when customs agents or non-conspiring supervisors presented a threat to the activities. Martinez paid Camejo $4,000 to $5,000 for each flight in which he participated. Luis Rivera–Torres worked inside the aircraft, removing cocaine-filled suitcases, and then passed the suitcases to drivers to be taken through the airport. Martinez paid Rivera–Torres $20,000 to $30,000 each time he performed these tasks. Livingston K. Smith was a transfer-point driver who delivered baggage from carts at the change-point for continuation on domestic flights. The normal loading procedure worked as a cover and at times functioned to create a diversion. Smith received $2,000 on one occasion from Martinez' wife, and admitted the receipt of payments on a few occasions for moving baggage in connection with Eastern flights.

Charges were brought against all of the known participants: Count 1 for the importation of cocaine and Count 2 for possession with intent to distribute cocaine. Guilty pleas were entered by 12 co-defendants. Three co-defendants were acquitted. Anchia, Camejo and Rivera–Torres were found guilty of both counts. Smith and Setien were found guilty of conspiracy to import.

## SETIEN

### *Prior Acts of Good Conduct*

■ Setien's witness Max Mermelstein made a proffer of his testimony outside the presence of the jury. He testified that during the period that Setien was accused of having been involved in the cocaine importation conspiracy, they met regularly as social friends. During that time, Mermelstein was involved as a high level importer and distributor of cocaine throughout the United States. He offered Setien the lure of easy money if he would quit his job as an Eastern Airlines baggage handler and just hang around Mermelstein while he conducted his narcotics business. Setien refused to involve himself in the narcotics business and repeatedly reminded Mermel-

stein of the damage he was doing to society.

The government filed a motion *in limine* objecting to Mermelstein's proffered testimony, on the ground that individual acts of good conduct cannot be permitted to demonstrate good character.

Setien argues that one of the essential elements of the offense charged was his *mens rea* during the time he was alleged to have agreed to join this conspiracy, and that Mermelstein's offer was relevant to show he was offered an opportunity to do the same thing and refused. The court ruled that the testimony was irrelevant under Rule 405(b) and was not admissible under Rule 404(b). We agree.

■ Evidence of good conduct is not admissible to negate criminal intent. *Michelson v. United States*, 335 U.S. 469, 477, 69 S.Ct. 213, 219, 93 L.Ed. 168 (1948); *United States v. Russell*, 703 F.2d 1243, 1249 (11th Cir.1983). Mermelstein's proffered testimony was merely an attempt to portray Setien as a good character through the use of prior "good acts". The trial judge properly exercised his discretion in excluding this testimony as inadmissible character evidence.

### Sufficiency of Evidence

■ "To determine whether sufficient evidence supports the convictions, we must view the evidence in the light most favorable to the prosecution and decide whether a reasonable fact finder could have reached a conclusion of guilt beyond a reasonable doubt." *United States v. Perez*, 922 F.2d 782 (11th Cir.1991) (citing *United States v. Sanchez*, 722 F.2d 1501, 1505 (11th Cir.), *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984)).

Setien submits that the finding of the jury that he was not guilty of conspiracy to possess the cocaine as it was being moved through the airport (count 2), eliminates the evidence so rejected from being considered on the conspiracy to import (count 1) and leaves his only participation the acceptance of "hush" money. Thus, Setien argues that when he decided not to "blow the whistle" on the operation, he was not entering into an agreement to import cocaine, he was merely agreeing not to report the existence of the criminal conspiracy to the authorities and that the benefit to the conspiracy was merely an incident of that separate agreement.

This argument is unpersuasive. The jury undoubtedly believed that Setien's involvement in the conspiracy to import ended after the drugs were taken off the aircraft and that he had nothing to do with the conspiracy to possess the cocaine with intent to distribute it. *See United States v. Johnson*, 889 F.2d 1032, 1035 (11th Cir. 1989) (per curiam). Our review is limited to whether the evidence is sufficient to support the guilty verdict returned by the jury as to Setien's participation in the conspiracy to import cocaine. *Id.*

Even if Setien's only involvement in the conspiracy was accepting hush money, he would be guilty of conspiracy to import cocaine. Proof that a conspiracy existed, and that Setien knew of its existence is overwhelming. Setien clearly understood the objectives of the conspiracy and that he would benefit monetarily from the successful goal of the conspiracy. This is not "mere presence" or "mere association"; this is an act from which the jury could infer an intent to participate in an unlawful enterprise. *United States v. Catchings*, 922 F.2d 777 (11th Cir.1991) (per curiam); *United States v. Jackson*, 700 F.2d 181, 185 (5th Cir.), *cert. denied*, 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983); *United States v. Hawkins*, 661 F.2d 436, 453–54 (5th Cir. Unit B 1981), *cert. denied*, 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982).

But Setien did more than simply accept hush money. He was paid as much as $10,000 each time a cocaine flight was offloaded. He was the lead man in his crew and physically supervised baggage handlers on his crew. On some occasions he acted as a lookout while other conspirators actually unloaded the cocaine from the aircraft. The jury could reasonably infer that Setien's action in supervising his crew as it unloaded contraband and in acting as a

lookout were knowing and intentional acts of participating in the conspiracy. *United States v. Gordon,* 712 F.2d 110, 114 (5th Cir.1983); *United States v. Diaz,* 655 F.2d 580, 584 (5th Cir. Unit B 1981), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982). *See, e.g., United States v. Pareja,* 876 F.2d 1567, 1570 (11th Cir.1989); *see also United States v. Pui Kan Lam,* 483 F.2d 1202, 1208 (2nd Cir. 1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1577, 1578, 39 L.Ed.2d 881 (1974) (acting as a lookout).

### *Theory of Defense Jury Instruction*

Setien's theory of defense instruction is based upon his argument that mere acceptance of hush money is not legally sufficient to convict him of importation of cocaine. The trial judge refused to give the instruction as not supported by the facts or by law.

■ A refusal to give a requested theory of defense instruction is reversible error only if the requested instruction "(1) was correct, (2) was not substantially covered by the court's charge to the jury, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Benz,* 740 F.2d 903, 910 (11th Cir.1984), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985).

■ For the reasons we have already stated, the proposed instruction is legally incorrect. Moreover, in addition to this receipt of hush money there was evidence that Setien acted as a lookout and supervised his crew's unloading of aircraft containing cocaine. Requested instructions on a theory of defense need not be given unless there is some foundation in the evidence for the proposed instruction. *See United States v. Gold,* 743 F.2d 800, 819 (11th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985); *United States v. Terebecki,* 692 F.2d 1345, 1351 (11th Cir.1982).

The requested instruction is Setien's version of the facts, and is more of a jury argument than a proper theory of defense instruction. It was properly denied. *See United States v. Russell,* 717 F.2d 518, 521 (11th Cir.1983).

### *Other Claimed Errors*

Setien argues that there was error in admitting financial evidence against him, and there was error in permitting the government to argue facts not in evidence relating to the financial evidence. A careful review of the record convinces us that Setien's arguments are without merit.

### ANCHIA

### *Court's Ex Parte Voir Dire of Juror*

On the second day of deliberations juror Delay failed to appear in court as scheduled. At the direction of the court a United States Marshal located her at her home and accompanied her back to the courthouse. The trial judge held an *ex parte* conference with her to determine the cause of her tardiness. Ms. Delay explained that she had been awake until very late the night before to be in the company of her girlfriend who had been battered by her husband. She described it as a terrible night that was upsetting. Nevertheless, she was emphatic that she was physically and mentally able to proceed as a juror, and, in fact, thought she should serve.

■ After the jury began deliberating, the court had the *ex parte* conference transcribed and immediately had the transcript read to all counsel. The defendant moved for a mistrial, or for the substitution of an alternate juror based on the exclusion of defense counsel from participation in the *voir dire* of the juror, and their belief that due to the juror's experiences of the night before, she was unable to carry out her full responsibilities in deliberating with the jury.[1] The court denied the motion finding there had been no prejudice from the inquiry and that the juror was fully capable of deliberating fairly.

---

1. All of the other defendants joined in the mo-     tion for mistrial.

The district court wisely had the *in camera* proceeding transcribed as was done in *United States v. Yonn*, 702 F.2d 1341 (11th Cir.), *cert. denied*, 464 U.S. 917, 104 S.Ct. 283, 78 L.Ed.2d 261 (1983), in order to "minimize the possibility of prejudice, by enabling the reviewing court to examine carefully whether any harm resulted from the *ex parte* contact between the judge and juror[s]." *Id.* at 1345. The harm done in this case, the defendants argue, was that the judge's *voir dire* of the juror was superficial and inadequate to uncover the bias and prejudice the juror may have developed. They rely on inferences that might be drawn from the juror's lack of sleep, the unknown effect of the cause of the domestic violence of the girlfriend and her husband, the possible use of drugs by the husband, and whether the husband was a Latin like the defendants. These and other questions, they argue, were proper to delve into by the defendants' cross-examination of the juror.

The short answer to this argument is that it amounts to no more than speculation and conjecture and has no support in the record. There is no suggestion that the juror's experiences of the night before with her girlfriend distracted her from her responsibilities, or could have possibly influenced her fairmindedness, or provided a natural motivation to conclude the jury's deliberation prematurely. *See Smith v. Kelso*, 863 F.2d 1564, 1572–73 (11th Cir.), *cert. denied*, 490 U.S. 1072, 109 S.Ct. 2079, 104 L.Ed.2d 644 (1989). In fact, the sole ground stated in the district court in support of this motion for a mistrial was that the juror was in no state of mind to fairly and impartially consider the defendants' guilt or innocence. The recitation in this court of what the defendants might have elicited from questioning the juror was neither submitted to nor argued to the trial judge.

■ Finally, the defendants exhort us to adopt a rule that absent consent of counsel, *in camera* examination of jurors should not be conducted by a trial judge without, at least, the presence of counsel. We decline this invitation to erode the court's discretion by such a blanket rule. Here the trial judge adopted the better approach in following what this court said in *United States v. Caldwell*, 776 F.2d 989, 997 (11th Cir.1985):

> [W]e see no prejudice, and perhaps even some benefit, to be gained by the defendants from their absence during the questioning of juror Campbell. Had the appellant actually been present and had counsel taken an active role in the questioning, it would have put the juror and the defendant in an adversarial posture, which could have an adverse effect on a juror.... Consequently, we find the appellant's absence from the proceeding did not result in prejudice to his due process rights, and any technical violation of Rule 43 was rendered harmless by the precautions taken by the district court.

There was no abuse of discretion in the judge's *ex parte* inquiry to ascertain the cause of the juror's tardiness in attending court. Nor do we find any prejudice resulting from that procedure. *United States v. Adams*, 799 F.2d 665, 667–68 (11th Cir. 1986), *cert. denied*, 481 U.S. 1070, 107 S.Ct. 2464, 95 L.Ed.2d 873 (1987).

### *Prosecutor's Closing Argument*

■ In his closing argument, the prosecutor pointed out the government's evidence of the defendant's unexplained wealth. The defendant had offered evidence that $16,000 of the money deposited in his account came from the sale of a truck in Houston, Texas and argued this to the jury. The prosecutor countered this by arguing that the so-called sale of the truck was a sham, that the money was paid to him by a co-conspirator. He argued that it was not reasonable for the jury to believe that the defendant could buy a truck for $12,000, use it for two years hauling sand and gravel over dusty roads and re-sell it later for $16,000. The defendant contends that he showed the prosecutor a letter from the Alvin State Bank in Houston which purportedly described the sale of the truck to a person named Mayor, and this being so, the government's closing argument was

improper and prejudiced the defendant's right to a fair trial.

The defendant did not offer the letter in evidence. It is not a part of the record before us. We are in no position to pass upon its authenticity or contents as corroborating evidence of the defendant. *Butterworth v. Bowen*, 796 F.2d 1379, 1387 (11th Cir.1986); *Lee County Branch of NAACP v. Opelika*, 748 F.2d 1473 (11th Cir.1984); *Int'l Business Machines Corp. v. Edelstein*, 526 F.2d 37, 45 (2nd Cir.1975). The government cannot be faulted for the failure of the defendant to make a record, nor can it be censored for arguing the evidence established by it without reference to a document that was not offered in evidence.

The government also offered evidence of unexplained wealth by introducing a wire transfer of $4,000 to the defendant by his wife while he was vacationing in Europe where he spent $8,000 in charges. The defendant contends that the prosecutor should not have argued in summation that the defendant's wife wired him the money from Miami to Rome because their passports showed that she accompanied him on the trip and the passports were shown to the government. The passports were not offered in evidence and no proffer was made. They are not a part of the record and are not before us. We decline to consider matters dehors the record. *Hassenflu v. Pyke*, 491 F.2d 1094 (5th Cir.1974) (per curiam). In any event, whether or not the defendant's wife went to Europe with him is of no moment since the fact remains that he spent $8,000 on a European vacation. The prosecutor's argument did not affect the substantial rights of the defendant.

### *Evidence of Uncharged Misconduct*

■ Defendant Anchia complains that the government's witness Washington implicated him in a cocaine importation that occurred on July 6, 1983 in spite of the government's discovery response that these conspirators did not import cocaine into the United States on that date.

During the government's examination of witness Washington, he started to testify concerning an involvement of Anchia in the importation of cocaine in July 1983. After a sidebar, the prosecutor limited his questions to the unloading of cocaine by Anchia "from any flights on times other than July 6, 1983." The witness responded that he had observed Anchia on two or three occasions unloading cocaine from flights during the year 1983, although he could not remember the month. Defense counsel did not object to this testimony. The government took pains to avoid questioning the witness concerning uncharged misconduct. The evidence was properly before the jury.

### CAMEJO

■ Defendant Camejo moved to strike the testimony of government witness Washington concerning the importation of cocaine on July 6, 1983, because the court had excluded such evidence under Rule 404(b). After the witness began to testify, the court excused the jury and directed the witness to base all of his testimony on events other than the July 1983 incident.

On cross-examination, Washington testified that he did not see Camejo participate in a cocaine transaction other than one time in July 1983. Camejo's motion to strike this testimony was denied. The motion should have been granted. A fair reading of the record leads to the conclusion that according to one government witness, Martinez, Camejo had been involved in only one narcotics transaction, occurring on July 6, 1983. Since the government had dismissed that allegation against Camejo, the witness's references to the event should have been stricken. However, we find this to be harmless error considering the overwhelming evidence of the guilt of Camejo.

That Camejo was a member of the conspiracy, knew about the unlawful importation of cocaine and took an active part in it can hardly be disputed. He talked with co-conspirators on numerous occasions about the conspiracy and how it was being carried on. He was the driver of carts around the airport to make sure that customs agents and other non-conspirators would not interfere with the conspirators' off-loading of the cocaine from the air-

planes by blocking the area from view, and, if necessary by creating a diversionary disturbance. He was involved in the conspirator's operations about twenty-five times and was paid $3,000 to $4,000 each time. There was evidence from which the jury could have found that Camejo loaned his company $100,000. We find that there is no "reasonable possibility that the evidence complained of might have contributed to the conviction." *United States v. Reed,* 700 F.2d 638, 646 (11th Cir.1983) (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)).

We have considered Camejo's argument that the district court abused its discretion by denying his motion to exclude testimony of his financial status and find that it is without merit.

## SMITH

### Motion for Severance

■ The government introduced in evidence without objection a book with the names and telephone numbers kept by the lead conspirator and government witness, Martinez. He testified that he kept the book in case he had to contact his co-conspirators in connection with the conspiracy. The book contained Smith's name and his mother's telephone number, but did not include the name of alleged co-conspirator Astiazarian or his number.

The prosecutor's closing argument pointed out the fact that Martinez recorded the number of Smith's mother so that Martinez could contact Smith. Counsel for co-defendant Astiazarian in his closing argument emphasized the fact that his client's name did not appear in Martinez' book and argued that "if it's [Astiazarian's name] in there [the book] you find him guilty because then he would have been part of the conspiracy. That would have corroborated it." Further, he stated, "[his name] is not in there because he wasn't part of the conspiracy".

At the end of the closing arguments, Smith moved for a severance because the focus of his co-defendant's counsel's argument was that the book was essentially a roster of those involved in the conspiracy. Therefore, those not in the book were not involved in the conspiracy, and those in the book were members of the conspiracy and should be convicted. The court denied the motion.

Smith insists that his motion for severance should have been granted because co-defendant's, Astiazarian, counsel's argument prejudiced Smith by a negative inference. Smith relies on *United States v. DeVeau,* 734 F.2d 1023 (5th Cir.1984), that by taking an adversarial stance on the part of co-defendant's counsel, that tactic generated prejudice to him as to deny him a fair trial. In this case, the court found that a severance was not warranted.

Neither Astiazarian nor Smith testified, and neither put on evidence implicating the other. Smith was not mentioned in his co-defendant's argument to the jury. Moreover, co-defendant Alonso, whose name and telephone number also appeared in the book, was acquitted. The court properly instructed the jury on three occasions that statements of counsel are not evidence.

In *United States v. Lee,* 744 F.2d 1124, 1126 (5th Cir.1984), the court succinctly stated:

> "The severance decision is reviewed under an abuse of discretion standard, and to prove an abuse the defendant undertakes the considerable burden of proving 'that he received an unfair trial and suffered compelling prejudice against which the trial court was unable to afford protection'". (Citations omitted).

Examination of the record in this case convinces us that Astiazarian's counsel simply cannot be cast in the role of a second prosecutor. His argument to the jury was directed toward establishing Astiazarian's innocence, not toward damning Smith.

The substantial evidence supporting Smith's conviction indicates that the trial, as a whole, was fair and Smith was not exposed to compelling prejudice against which the district court was unable to afford protection.

618

Finally, Smith asserts error in the admission of a statement against interest made by him, and the prosecutor's mischaracterization of evidence against him in closing argument. We find no merit to either contention.

## RIVERA–TORRES

 Torres argues that the evidence was insufficient to sustain his conviction, thus the district court erred in denying his motion for acquittal. He contends that the government's witnesses' contradictory statements and motives made them inherently unreliable. "To determine whether sufficient evidence supports the convictions, we must view the evidence in the light most favorable to the prosecution and decide whether a reasonable fact finder could have reached a conclusion of guilt beyond a reasonable doubt." *United States v. Perez*, 922 F.2d 782 (11th Cir. 1991).

The evidence against Torres was not only adequate to establish him as an active conspirator at the heart of the conspiracy, but was compelling.

## CONCLUSION

The judgment of conviction of each defendant is affirmed.

AFFIRMED.